INTERNATIONAL TRAVEL ADVISORS, INC., Petitioner-Appellant,

v.

STATE TAX COMMISSION of Missouri et al., Respondents-Respondents.

No. 60159.

Supreme Court of Missouri, en banc.

June 15, 1978.

Rehearing Denied July 24, 1978.

Joseph B. Meives, George J. Leontsinis, St. Louis, for petitioner-appellant.

John D. Ashcroft, Atty. General, S. Joel Wilson, Asst. Atty. Gen., Jefferson City, for respondents-respondents.

FINCH, Judge.

International Travel Advisors, Inc. (Intrav), in filing its 1970 income tax return pursuant to then [1] § 143.040, RSMo 1969,[2]

1. Sec. 143.040, RSMo 1969, was repealed in 1972. Laws 1972, p. 698, § A, eff. Jan. 1, 1973.

It was replaced by §§ 143.071 and .441, both Laws 1972, p. 699, § A, eff. Jan. 1, 1973.

2. The pertinent portions of § 143.040, RSMo 1969, provided:

"1. Each year, . . . a tax shall be levied upon, assessed against, collected from, and paid by every corporation, . . . licensed to do business in this state, . . . in such percent, as now or hereafter provided, of the

elected to compute its tax in accordance with the alternative method authorized in § 143.040.2.[3] The Director of Revenue assessed additional tax of $4,806.89 on the basis that Intrav should have included 50% of receipts from transactions allegedly occurring partly in Missouri and partly elsewhere. After the Director of Revenue denied Intrav's petition for abatement, Intrav appealed to the State Tax Commission (Commission) which approved the assessment. Intrav then filed a petition for review in the circuit court. It affirmed, after which Intrav appealed to this court. We have jurisdiction because the appeal involves construction of a revenue law of this state. We affirm.

Intrav is a Missouri corporation engaged in the business of packaging, marketing and conducting back-to-back group charter tours to foreign countries. A chartered plane operates on a continuous shuttle between various cities in the United States and the foreign cities to be visited. The plane brings a tour group from the United States to the first city on the tour. When that group deplanes, the members of the preceding tour are taken on board and flown to the next city. The incoming group occupies the hotel rooms just vacated by the departing group. This process is continued until all scheduled tours are completed. In 1970 those tours were to the Orient and to Africa. These tours were planned in Intrav's home office in St. Louis where all of its employees were located. Intrav had no offices elsewhere.

Before any tours were sold, representatives of Intrav visited the cities to be included in a tour and made arrangements for hotels, restaurants, baggage handling, ground transportation, various sightseeing tours and other details, including arrangements for a staff to set up and operate a hospitality desk in the hotel lobby in each city visited. Various airlines were contacted and following negotiations one airline was chosen to carry all passengers on the tours for one season. Intrav would then prepare printed brochures giving the details of each tour, plus sample form letters and other materials to be used in selling the tours.

After these arrangements had been completed, Intrav's five salesmen then traveled from their office in St. Louis to visit various professional and social organizations throughout the United States in an attempt to persuade them that these tours would be of benefit to their members and that they should sponsor a tour for members. Such organizations were utilized because they provided an established group which would

net income from all sources in this state during the preceding year. Income shall include all gains, profits and revenue from the transactions of the business of the corporations in this state, including gains, profits and revenue from the doing in this state of such portions of each transaction of the business of the corporation which transaction is partly done in this state and partly done in another state or states, . .

"2. Where income results from a transaction partially in this state and partially in another state or states, and income and deductions of the portion in the state cannot be segregated, then such portion of income and deductions shall be allocated in this state and other state or states as will distribute to this state a portion based upon the portion of the transaction in this state and the portion in such other state or states. The taxpayer may elect to compute the portion of income from all sources in this state in the following manner: The net income from all sources shall be determined as now or hereafter may be provided, . . . The amount of sales which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state, and the amount thus obtained shall be divided by the total sales or in cases where sales do not express the volume of business, the amount of business transacted wholly in this state shall be added to one-half of the amount of business transacted partly in this state and partly outside this state and the amount thus obtained shall be divided by the total amount of business transacted, and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of tax, and the amount of tax shall be such percent thereon as may now or hereafter be provided. . . . . "

**3.** All statutory references are to RSMo 1969 unless otherwise indicated.

satisfy regulatory provisions applicable to charter flights and because selling the tours in this manner avoided the expense and management headaches of establishing and maintaining branch offices in various parts of the country.

The salesmen had no authority to alter the tours to meet special requests. They were to be sold only as previously packaged. When an organization contacted by a salesman agreed to sponsor a tour for its members, arrangements were made for the organization to mail the previously prepared brochures and an accompanying letter to members. For this purpose, the brochures and other materials were sent from St. Louis to the sponsoring organization. The organization was reimbursed for its actual out-of-pocket expenses, including secretarial work and postage, but it was to receive no other compensation of any kind. No contract between Intrav and the sponsoring organization was signed and the latter incurred no contractual or financial obligation to Intrav by assuming such sponsorship. It assumed no responsibility for the tour. That was the obligation of Intrav. The sponsoring organization was required to sign a charter contract for the airplane with the airline company but the sponsor had no financial obligation therefor. That was taken care of by Intrav.

The brochures gave details of the tour including place and time of departure, places to be visited, the names of the hotels, a listing of what the tour included, weight allowance, the price of the tour and other information. All brochures were identical except for time and place of departure and the name of the sponsoring organization printed on the top of the front page and in the reservation coupon on the back page.

Persons interested in making the tour were instructed to clip a reservation coupon from the back of the brochure and mail it, along with a deposit of $100.00 per person, to the headquarters of the sponsoring organization. The coupon for the Orient tour, which was typical, read: "Enclosed is my check for $_____ ($100 per person) as deposit. I understand the total deposit will be refunded if it becomes necessary to cancel my Orient Adventure membership at least 60 days before departure, when final payment is due." It then was followed by the name and address of the member making the reservation.

Upon receipt at a sponsoring organization's headquarters of a reservation coupon and check, it would be recorded in the manner and on forms specified by Intrav after which the coupon and money were forwarded on to Intrav's St. Louis office. The sponsoring organization would mail to its member a "Welcome Aboard" letter, the form for which had been furnished by Intrav's salesman. The letter provided additional information concerning the tour.

Approximately 90 days before scheduled departure of a particular tour, Intrav, from its St. Louis office, would send to those who had sent in reservation coupons a bill for the balance of the tour price. Payment of the balance due was made directly to Intrav in St. Louis. However, the member still had the right at any time up to 60 days before departure to secure a refund of his initial deposit. If he did that, he had no obligation to pay any part of the subsequent billing. However, if the member cancelled less than 60 days before scheduled departure, he forfeited his original deposit and, if the balance of the tour price had been paid, he also forfeited that portion thereof attributable to the cost of air transportation unless Intrav sold the space to some other member. Upon receipt from a member of payment of the balance due for the tour, Intrav mailed from St. Louis to that member final flight information, including an official "Welcome Aboard" letter, departure details, passport cases, restaurant coupon books, and information concerning optional sightseeing tours offered by Intrav at the various places to be visited.

Tours departed from and returned to an airport near the headquarters of the sponsoring organization. Each tour was accompanied at all times by one of Intrav's regular tour directors from the St. Louis office or occasionally by other personnel from that office who acted as tour director. They

processed the group onto planes, trains and buses and through transportation terminals and hotels, also handling any individual problems or special requests. This tour director was with the group from time of departure until the group returned to the city from which it had departed.

In 1970 there were 35 charter trips to the Orient on which there were 5,666 passengers and there were 20 charter trips to Africa on which there were 3,111 passengers. Five of these flights, on which there were 446 passengers, originated from Missouri airports. The other flights originated from airports in other states.

In preparing its 1970 Missouri income tax return, Intrav included in determining the numerator of the elective allocation formula only receipts from passengers whose planes departed from Missouri airports. Receipts from the passengers on all other flights were excluded therefrom but all such income was included in the denominator. This was done on the basis that these were derived from sales made wholly outside of Missouri and that such receipts were to be excluded pursuant to the elective alternative formula provided in § 143.040.2. The Department of Revenue took the position that 50% of receipts from flights originating outside Missouri should be included and on that basis assessed the additional tax against Intrav.

Intrav argues that the original offers of the tours were mailed from the sponsoring organization's office to people residing outside Missouri and that such offers were accepted by members executing and mailing the reservation coupon, accompanied by a check, also done outside Missouri. Thus, says Intrav, these were sales outside Missouri and no part of the income therefrom is includable in making the computation under the alternative elective formula.

Resolution of the issue presented depends on how the provisions of § 143.040 are interpreted. In subsection 1 thereof, an income tax is imposed on net income from all sources in Missouri. The subsection goes on to provide that such income includes all gains, profits and revenue from *transac-tions* of business in this state, including income from the portion done in this state of *transactions* done partly in Missouri and partly elsewhere. In subsection 2, it is provided further that where income results from a *transaction* conducted partly in this state and partly elsewhere and such income cannot be segregated, a portion thereof shall be allocated to Missouri on the basis of the portion of the *transactions* done in this state. Evidently in recognition that such allocation may be difficult, the subsection gives the taxpayer an option to utilize a formula in computing its tax. That formula provides:

" . . . The net income from all sources shall be determined as now or hereafter may be provided, excluding therefrom the figures for the operation of any bridge connecting this state with another state. The amount of sales which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state, and the amount thus obtained shall be divided by the total sales . . . and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of tax, and the amount of tax shall be such percent thereon as may now or hereafter be provided. . . . "

Section 143.040 was construed by this court in *State ex rel. River Corporation v. State Tax Commission,* 492 S.W.2d 821 (Mo. 1973). Taxpayer therein operated a cement plant in Missouri. It had terminals in various other states to which it shipped cement. Each terminal had a sales office and sales staff. As sales were made by those salesmen, cement was shipped from a terminal to the customer. River Corporation paid income taxes to six other states based on the proportion of sales made in those states. The issue presented was whether sales from these out-of-state terminals should be taxed as Missouri income.

River Corporation argued that under the subsection 2 elective formula, which it had

utilized, the formula for assessment of taxes was based on *sales* and that the sales in question were made wholly outside the state of Missouri. The Tax Commission argued that § 143.040 imposed a tax based on *transactions,* of which sales were only a part, and that material portions of the transactions involved had occurred in Missouri. The opinion in *River Corporation,* while recognizing that the tax imposed by the provisions of subsection 1 was on the revenue from *transactions,* concluded that the subsection 2 alternative formula was based on *sales* rather than *transactions.* On that premise it was held that Missouri tax was not due.

■ On reconsideration of the provisions of § 143.040, we have concluded that our decision in *River Corporation* that the tax is on *sales* rather than *transactions* where the elective formula of subsection 2 is utilized is incorrect. Actually, the tax is imposed by the terms of subsection 1. The language thereof makes it clear that the tax is on income from *transactions* and where transactions occur partially in Missouri and partially elsewhere, the portion allocable to Missouri is to be included in the tax computation. Subsection 2 does not impose a different tax. In fact, it does not purport to levy a tax at all. Rather, it deals only with how to compute the tax levied in subsection 1. Thus, the income to be taxed continues to be income from *transactions.* This is recognized in the first part of subsection 2 which continues to speak of income from *transactions.* Then, in providing for an alternate formula for computation of the tax previously imposed, the subsection mentions both *transactions* and *sales.* It states in part: "The amount of sales which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state * *." This reference to sales at this point does not have the effect of imposing a tax on a different basis than that imposed on other taxpayers not employing the alternate formula. The basis remains the same. What this formula does do is to provide an alternate simplified method of *computing* the tax where there are transactions which occur partly in Missouri and partly elsewhere. We look to whether in fact there was income from business transacted partly in Missouri and partly elsewhere and where that is the situation the amount of taxable income therefrom is determined by a formula based on the volume of sales receipts from such transactions. Instead of seeking to determine an appropriate percentage of income from such transactions, the formula arbitrarily uses 50% of the entire sales income from such transactions (partly in Missouri and partly elsewhere) to determine the numerator of the fraction.

■ As previously noted, Intrav argues that the place where a proposal is accepted and a contract made is the place of sale and that if that is outside Missouri such sales are entirely outside Missouri and are not to be included in computation of tax due under the alternate formula. If that interpretation were correct, then there would be no income apportioned between Missouri and other states. Income would be totally Missouri income or wholly income in other states, depending on where the contract was accepted. This is not what the legislature contemplated when it adopted § 143.-040 because it spoke of and undertook to tax income derived from *transactions* occurring partly in Missouri and partly elsewhere. The legislature intended to tax income from *transactions,* including portions of income from transactions performed only in part in Missouri, not income only from sales where the contract was accepted in Missouri.

The Commission found that the transactions whereby Intrav planned, packaged, sold and implemented these back-to-back charter tours were performed partly in Missouri and partly elsewhere. As indicated by the facts recited at the outset of this opinion, this finding is supported by substantial evidence. The Commission also arrived at the legal conclusion that the contracts on flights originating outside Missouri were accepted in Missouri. We need not consider whether such legal conclusion was right or wrong. It makes no difference where the actual point of sale occurred so long as the

transaction occurred partly in Missouri. In such case, 50% of all sales income attributable to the transaction, regardless of the place where the actual contract of sale was made, shall be included in the numerator of the alternative formula of § 143.040.2 that Intrav elected to use in this case. To the extent that *State ex rel. River Corporation v. State Tax Commission, supra,* holds to the contrary, it should no longer be followed.[4]

For the reasons stated, the judgment is affirmed.

MORGAN, C. J., BARDGETT, DONNELLY, RENDLEN and SEILER, JJ., and HOUSER, Special Judge, concur.

SIMEONE, J., not participating because not a member of the court when cause was submitted.

---

**4.** This does not mean that we are indicating that a different result would follow if the interpretation of § 143.040 herein adopted were applied in that case. That question is not before us. There were substantial factual differences between *River Corporation* and the instant case. For example, in that case, the taxpayer had branch offices from which sales were made and goods shipped and income taxes were paid other states.